**STATE of Missouri ex rel. ST. LOUIS SOUTHWESTERN RAILWAY CO., Relator-Appellant,**

v.

**PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent.**

No. 25305.

Kansas City Court of Appeals, Missouri.

Feb. 2, 1970.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 6, 1970.

---

Coburn, Croft, Kohn & Herzog, John R. Musgrave, St. Louis, Harry B. LaTourette, Jr., Tyler, Tex., for appellant.

Jeremiah D. Finnegan, General Counsel, Errol D. Taylor, Asst. General Counsel, Jefferson City, for respondent.

MAUGHMER, Commissioner.

Appellant, the St. Louis Southwestern Railway Company (Cotton Belt), on November 21, 1967, posted a notice of its intention to close the agency station at Bell City, Missouri. Written protests were filed with the respondent, Public Service Commission of Missouri. A hearing was held at Sikeston, Missouri on January 9 and 10, 1968. On May 15, 1968, the commission handed down its decision denying appellant's proposal to close the station. The company's application for rehearing was denied. On review the circuit court affirmed and the company has appealed.

Bell City is an incorporated town. It is located in southeast Missouri in Stoddard County, and according to the latest census has a population of 409. It has no bank and all agree that the area is strictly a farming community. A commercial truck company operates a truck freight line through the town.

The only railroad which passes through Bell City is that of the appellant Cotton Belt. It furnishes no passenger service. Its freight service has for some time been limited to carload lots. No LCL (less than carloads) except cotton are accepted. The company maintains a resident agent there who is on duty from 7 A. M. to 4 P. M., Mondays through Fridays. The facilities at Bell City include a depot, an unloading platform with ramp, and a rail siding with passing track. No maintenance or repair crews are stationed at Bell City. This office in addition to Bell City, now services five smaller villages where blind sidings are located. The places are named Perkins, Painton, Mesler, Heagy and Avert, Missouri. They are two, three and five miles from Bell City. The station agent does not leave Bell City to transact any company business. He may possibly inspect small claims of damage but may not adjust the same. In fact, under the company rules and union requirements he is not supposed to either inspect or report on claims for damage. Such claims are now investigated and adjusted by claims representatives from the company's offices in Tyler, Texas. Shippers who desire to have

empty cars dropped off at any of these five sidings, which are located a few miles to the north and south of Bell City, must order the same by telephone, by letter or after a personal visit to the agent in Bell City, who transmits the order to the Malden office. Bills of lading for outgoing freight may be prepared by the resident agent.

The company proposes to transfer the functions of the Bell City station agent to the much larger office at Malden, Missouri. Malden is a town of more than 5,000 population. The office there is open seven days per week and 24 hours each day. Maintenance and repair crews headquarter there. Malden is 38 miles by rail and more than 40 miles by highway from Bell City. Under the proposed plan the patrons now receiving or sending freight from Bell City or from any one of the other five sidings would have to contact the Malden agent to order empty freight cars. Likewise bills of lading would have to be issued by the Malden agency, based upon information furnished by the shipper either by mail, by telephone or in person. Also bills of lading might be prepared by the shipper or one of his employees who might be designated as a caretaker by the railroad.

From January 1, 1964 to July 31, 1967, 21 carloads of freight were shipped from Bell City itself. During this same period only 13 different customers received freight at Bell City. They received a total of 72 carloads, but of these 13, six received two or less carloads. Mr. J. W. Ellis, Cotton Belt assistant accountant, produced company records covering the area served by Bell City, which includes the communities of Perkins, Painton, Mesler, Heagy and Avert. These records showed that from January 1, 1964 to July 31, 1967, freight from these six places returned total revenues of $310,214.73; assignable revenues of $156,741.85, and net earnings of $128,771.38. Closing of the Bell City station would result in a saving of $8,000.00 per year to the railroad. There was testi-

mony that the outgoing volume of freight might increase if crops in the area became more plentiful and if the St. Joseph Lead Company plant which was under construction began operations.

Mr. S. S. Puckett, supervisor of stations for appellant, said he believed the seven-day, 24-hour service at Malden would be better service than the eight-hour, five day per week present service at Bell City. In his judgment the agent at Bell City during many months had practically nothing to do.

Much of the testimony concerned the probable procedure for preparing shipments, bills of lading, ordering freight cars to be dropped off at the sidings, how to repair them if they were defective for their proposed use, processing claims for damages allegedly incurred, disputes as to the proper rates applicable, and any other misunderstandings which might, and certainly would in many instances, arise.

The Cotton Belt representatives contended: that shippers could either prepare their own bills of lading or transmit data therefor to the Malden agent by letter or by telephone; that small claims (less than $50.00) would be accepted without checking; that for larger claims a representative from Tyler, Texas would investigate, which is in fact the present procedure; that when an empty freight car was needed at any of these sidings, a telephone call to Malden (charges paid by the railroad) describing the type of car needed, would result in its being supplied. This is the procedure now followed except the calls now go by way of the Bell City Office. It was claimed that the contentions of objectors that the amount of freight served by Bell City would increase because of (1) increased crops, (there being evidence that the cotton production had fallen off tremendously during the immediately preceding years) and (2) completion of the St. Joseph Lead Company's plant, were both purely speculative.

The objectors insisted that placing them 38 miles by rail and over 40 miles by high-

way from an actual agent or any personal representative would result not only in certain delay, but would constitute inconvenience amounting to actual hardship. They said that at present the Bell City agent personally inspected both allegedly damaged freight shipments and unsuitable empty freight cars, and that if the change were made (the agent at Malden admittedly would not personally come to Bell City and make such inspections) then on sizeable claims they would have to wait for a claims man to come from Tyler, Texas. They expressed doubt too that the railroad would actually allow claims of $50.00 and less without some independent or railroad representative proof of such damages.

Mr. H. J. Painton of the Albert Painton Company, testified that he operated a large farm near the Painton, Missouri siding which is five miles from Bell City. In 1964 he shipped 52 carloads of grain; in 1965, 60 cars, in 1966, 22 cars, and in 1967, 19 cars. He said his practice at the present time was to drive to Bell City to order cars and secure bills of lading. He thought it would be inconvenient to transact this business by telephone and a hardship to drive the nearly 50 miles to Malden.

Mr. Larry Shobel lives near Heagy, three miles from Bell City, and uses the siding there. He had shipped seed beans to the Republic of Mexico, and likewise thought it would be inconvenient and a hardship if the Bell City station agent were eliminated. Mr. William Kilbury, the manager of Ringer Hill Farms at Painton, which comprised 1,000 acres, thought it would be a hardship and an inconvenience if the Bell City station were closed. This witness as manager of the Ringer farms, did not send or receive any freight over the Cotton Belt line. He said, however, that he considered himself an indirect user because he bought fertilizer from a farmers' co-operative in the neighborhood and sold grain to the Semo Grain Company which operated elevators in the vicinity. No testimony, pro or con, was offered from any representative of the co-op where the farmers buy their fertilizer. Mr. Tyre Brown was a well driller. He testified that there were valuable clay deposits in the area and said there was a clay company and the St. Joseph Lead Company which were developers and would most likely be customers of the rail facilities in the future.

Mr. R. M. Limbaugh of Heagy, Missouri, said he was a farmer; that he owned 3200 acres of land around Bell City, also land in Illinois, and at a place identified only as Cape Lake. He said he bought fertilizer in carload lots at Heagy and also bought some at the towns of Advance and Brownwood. He testified that he shipped most of his grain through the Semo Grain Company and none directly himself. He expressed no opinion as to whether or not the proposed closing of the agency would work a hardship or constitute an inconvenience to the community. Mr. James DeLay lives in Bell City and is a retail dealer in farm implements. However he does not ship by rail but uses the truck line since his shipments are less than carload lots.

Mr. Max Bollinger, Mayor of Bell City, testified that the town had recently installed a water system and had made some industrial surveys with the hope of attracting industries. Mr. Bollinger operates a hardware store but his freight is transmitted entirely by truck since his shipments are in less than carload lots. His objections would appear to stem largely from local civic pride rather than from any inconvenience or hardship which he himself would suffer, or which he was able to point out with respect to any other actual shipper. It seems apparent that the prospects, if any, of attracting industries to Bell City are rather illusory. There was general testimony that the telephone service was poor, especially to Malden, although exactly what defective conditions resulted in this poor service were not stated. Telephone communication in that area is supplied by Southwestern Bell.

Mr. Ben Bowman, vice president and secretary of the Scott County Milling Company, Sikeston, Missouri, testified. He said that the Semo Grain Company which was mentioned by many of the farmers in the six communities as being the elevator company where the farmers for the most part sold their grain, was a wholly-owned subsidiary of the Scott County Milling Company, and that it had elevators at several places in the area. Mr. Bowman, speaking for himself and for his companies, approved and supported the proposal to close the agency at Bell City. It was his expressed opinion that insofar as his companies' needs were concerned the transfer would result in improved service rather than poorer service because, first, the offices at Malden would be open seven days a week, 24 hours per day, and second, the Cotton Belt would appoint one of Semo's employees as a caretaker and authorize him to prepare and issue bills of lading.

Mr. Norvall E. Knepper, general agent, traffic department, Cotton Belt, Blytheville, Arkansas, produced company records indicating that the railroad company in 1967 handled only approximately one-third of the wheat, 5% of the corn, and 12% of the soybeans produced in Stoddard County. Mr. Knepper referred to the St. Joseph Lead Company development and said that discussions had already been held with that company as to multiple-car rates on proposed shipments from its new situs in Moclay to Bonne Terre, Missouri, which would be a two-line haul—Cotton Belt and Missouri Pacific.

In its decision the commission, after reviewing the evidence, stated in part: "The issue * * * is whether or not the public convenience and necessity requires continued operation." The respondent Cotton Belt Railroad maintains that this is not the proper rule; that the true and correct test is whether or not the proposed change is unreasonable, unlawful and arbitrary. The commission's opinion then notes that the profit or loss factor in the proposed change is not controlling, but "station expenses must be considered to determine if savings which would be effected by the proposed change in operations would be disproportionate to the inconvenience caused the public." On this savings question, the commission incorporates an opinion by a labor union representative that under the union contract the agent cannot be replaced by a caretaker employee unless he is paid the same compensation, and that the union agreement does not authorize caretakers to sign bills of lading. Such testimony conflicts with that of the railroad company's assistant special accountant. We do not regard this dispute as to savings as being vital. It is a resultant factor, but is not the ultimate question. The opinion then concludes that "Public convenience and necessity require said agency station should not be discontinued * * *." and denied the application.

■ Appellant makes two assignments of error. It says the commission did not apply the proper rule in denying the request to close the agency station at Bell City. In Public Service Commission v. St. Louis-San Francisco Ry. Co., en Banc, 301 Mo. 157, 256 S.W. 226, 228, the Supreme Court stated that as far as service is concerned the carrier may in the first instance determine for themselves its character and extent, may make such changes as they deem proper, and only when such service is or becomes "unreasonable, unsafe, improper or inadequate" may the commission interfere. Our own court in State ex rel. Wabash R. Co. v. Public Service Commission, 379 S.W.2d 206, used the phrase "reasonably safe and adequate". The commission in the matter before us said, "The issue is whether or not the public convenience and necessity requires continued operation." While this phrase is not the one usually used, we do not regard the departure as vital. The controlling question, we think, is whether or not the facts and the evidence as a whole show substantial and competent evidence that closing the Bell City station would result in making the

service furnished "unreasonable, unsafe, improper or inadequate." If it does, we must affirm because such is the extent of our authorized review of the findings and orders of administrative bodies. We do not review and consider de novo. Kansas City v. Rooney, en Banc, 363 Mo. 902, 254 S.W.2d 626; Dixon v. Art Bunker Motors, Inc., Mo.App., 387 S.W.2d 199, 203. Unless we do find such substantial and competent evidence, we should reverse.

We have pointed out that the Supreme Court long ago in Public Service Commission v. St. Louis-San Francisco Ry. Co., 301 Mo. 157, 256 S.W. 226, 228, ruled that "It is only when the service * * * furnished is, or becomes 'unreasonable, unsafe, improper or inadequate' that the Commission may interfere." In State ex rel. Wabash R. Co. v. Public Service Commission, Mo.App., 379 S.W.2d 206, 207, the commission ordered the railroad to maintain a full time agent, instead of a part-time agent at Hallsville. The largest shipper, as here, approved the proposed change. Citizens of Hallsville and some small shippers opposed it. This court held that under the evidence it did not appear that the changed service was "unreasonable, unsafe, improper on inadequate", and voided the commission's order.

In Re Missouri-Kansas-Texas Railroad Company, 8 Mo.P.S.C. (N.S.) 230, concerns the proposed closing of an agency station at McKittrick, Missouri. McKittrick had a population of less than 100 people and lies in a rich agricultural area. The agency operation showed a profit. Services other than freight had been previously discontinued. The nearest stations would be four and 16 miles away. There was no truck line freighting through McKittrick. These agents, at request of shippers by telephone would send suitable empty freight cars and would issue bills of lading. The testimony was that telephone service was poor. The commission held that a public need existed during June and July—the harvest season—but approved the change for the other ten months.

In re Missouri Pacific RR. Co., 2 Mo. P.S.C. (N.S.) 568, the railroad sought to close the station at Labadie, Missouri. Labadie has a population of 375. Freight alone is there handled. The nearest stations are two and four miles distant. The station operated at a small profit. Shipments at consignee's risk and bills of lading are provided for customers. This station handled less than carload lots but the commission ruled it could be handled efficiently at other stations and approved the closing.

A station closing was approved where the nearest station was 13 miles away. In Re Mo. Pac. R R. Co., 11 Mo.P.S.C. (N.S.) 425.

We must bear in mind that at the present time, excepting only cotton, no freight is accepted in less than carload lots. So far as the record made is concerned, there is no criticism levelled at the present methods of handling cotton shipments and there is no suggestion that the proposal to eliminate the station agent would result in hardship or inconvenience to any shipper of cotton. Our concern therefore is with respect to carload shipments—incoming and outgoing—of other kinds of freight. Apparently—based upon the record before us, there are no retail businesses in Perkins, Painton, Mesler, Heagy and Avert, the five places where blind sidings are now located, and which will continue to be maintained. Two merchants from Bell City testified. One, Mayor Bollinger, operates a hardware store but his freight is handled exclusively by the truck line. His freight business will be entirely unaffected by the proposed agency closing. Mr. De-Lay is a retail farm implement dealer. He said his freight—incoming and outgoing—was hauled by the truck line, since his loads were less than carload lots. The proposed change would not require even a readjustment in his freighting procedures.

We now review, consider and evaluate the evidence as to individual farmers in the area, the farmers' co-op where most of the farmers buy their fertilizer, the Semo

Grain Company which operates grain elevators in the community and where most of the local grain production is sold, the St. Joseph Lead Company, and the fact that the nearest agency under the new proposed set up will be at Malden, 38 miles by rail and more than 40 miles by highway from Bell City.

We find testimony from only two farmers who actually have since 1964 shipped over the railroad. Mr. Painton who lives five miles from Bell City, shipped grain out. It was his practice to drive to Bell City where the agent prepared his bills of lading. He thought it would be inconvenient and a hardship to be required to travel some 35 miles farther to Malden. He seemed reluctant to even consider using the telephone to give the bills of lading data to the Malden agency. Mr. Shobel had during some of the years, shipped soybean seed into Mexico. His testimony was similar to Mr. Painton's. We believe these two shippers will suffer some inconvenience if the agency is closed—certainly until they adjust to transacting their shipping business by phone. Mr. Kilbury, manager of the Ringer Farms, has not used the Cotton Belt freight service. Mr. Limbaugh, a large land owner and operator, has received some fertilizer by rail. He sells his grain to the Semo Company, which in turn ships to the central markets. Mr. Limbaugh was not asked, nor did he express any opinion as to whether or not the proposed closing would amount to a hardship or any degree of inconvenience.

From the record it appears that the Farmers' Cooperative and the Semo Grain Company are the largest users of the Cotton Belt freight service in the Bell City area. No representative of the co-operative offered testimony pro or con as to the proposed change. Mr. Ben Bowman is secretary and vice president of the Scott County Milling Company. The Semo Grain Company is its wholly-owned subsidiary. He favored the transfer to Malden. He believed 24-hour daily service seven days per week was preferable to 8-hour daily, five days weekly service. He preferred having a caretaker in the Semo office prepare the bills of lading instead of going to the station agent. The coming St. Joseph Lead Company shipments have been covered by the planned multiple-car shipments and rates on a joint haul by the Cotton Belt and Missouri Pacific.

■ We believe it is self evident that for the ordinary shipper a resident agent, a few blocks, two, three or five miles away, is more convenient and poses less of a hardship than to have an agent 40 miles away. However, this fact, plus the inconvenience accuring to Mr. Painton and Mr. Shobel, the only two farmers who have been actual users, constitutes the total evidence as to inconvenience and hardship. Is this sufficient to amount to substantial credible evidence that the Cotton Belt freight service after and because of the proposed change will become "unreasonable, unsafe, improper or inadequate" and that it will amount to "an inconvenience or a hardship" to the community? We do not believe it is.

Therefore, the judgment of the trial court is reversed and the cause remanded with directions that it set aside the report and order of the commission and remand the cause to the commission for further proceedings in accordance with this opinion.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.